# United States Tax Court

T.C. Memo. 2026-66

ALADAR DEUTSCH AND SYLVIA G. DEUTSCH,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 27113-14.                          Filed August 12, 2026.

————

*Mel E. Myers*, *Stuart H. Clements*, *Charles J. Muller III*, and *Jaime Vasquez*, for petitioners.

*Sheila R. Pattison* and *Roberta L. Shumway*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, *Judge*: By statutory Notice of Deficiency dated August 27, 2014, the Internal Revenue Service (IRS or respondent) determined a deficiency in petitioners' federal income tax of $107,913 and an accuracy-related penalty pursuant to section 6662(a)[1] of $21,583 for the 2010 taxable year. After certain concessions by the parties,[2] the

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2] As relevant here, pursuant to the Notice of Deficiency the IRS disallowed $100,000 of petitioners' claimed miscellaneous itemized deduction for investment expenses of $448,942 and asserted various grounds for the imposition of the accuracy-related penalty. Petitioners now concede that they are not entitled to the miscellaneous itemized deduction for investment expenses in an amount greater than what the IRS allowed in the Notice of Deficiency, and respondent now concedes that

**Served 08/12/26**

**[\*2]** issues remaining for decision are whether petitioners[3] (1) are entitled to a deduction for a theft loss claimed on their 2010 Schedule A, Itemized Deductions, of $1,377,005 and (2) are liable for the accuracy-related penalty for a substantial understatement of income tax. We resolve the first issue partly in petitioners' favor and the second issue in petitioners' favor.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The Stipulation of Facts and the attached Exhibits are incorporated herein by this reference. Petitioners resided in Texas when their Petition was timely filed with the Court.

I.    *Background*

Mr. Deutsch is a self-employed businessman and has worked in his family's retail jewelry business since 1990. Before joining the family business, Mr. Deutsch worked for four years in international development at Laredo National Bank. Before that, he worked for two years as a stockbroker after he graduated in 1982 from Trinity University, where he studied business.

In 1987 or 1988 Mr. Deutsch met and became close friends with Alton Ray Lamberth, who, in turn, was close friends with Paul Visel.[4] Mr. Deutsch met Mr. Visel around 1995 through Mr. Deutsch's family's jewelry business. Mr. Visel became a frequent and trusted customer of Mr. Deutsch. Mr. Deutsch would regularly lend Mr. Visel several pieces of jewelry at a time, and Mr. Visel would return to pay for what he wanted and give back those pieces that he did not want. Eventually, Mr. Deutsch and Mr. Visel became social friends through their mutual relationship with Mr. Lamberth.

The three men went on hunting trips at the ranch Mr. Visel managed where they discussed different business deals. Before the transactions at issue, Mr. Deutsch entered into deals with Mr. Visel, none of which were successful. The first such unsuccessful deal occurred

---

he seeks to impose on petitioners only an accuracy-related penalty for a substantial understatement of income tax.

[3] Mrs. Deutsch did not appear at trial, but the Court's decision will be binding upon both spouses.

[4] Mr. Visel is the godfather to Mr. Lamberth's eldest son. In addition to their close friendship, the two have engaged in successful business deals together.

[*3] in 2001 when Mr. Deutsch invested $50,000 in a publicly traded company, Treasury International, after Mr. Visel told him he was a shareholder in the company and explained its business to him. After another hunting trip in 2004, Mr. Deutsch invested an additional $100,000 in Treasury International and $200,000 in a different publicly traded company, Information Architects, on the basis of Mr. Visel's suggestions. Mr. Deutsch never received a return on these investments. Eventually, he wrote those investments off as long-term capital losses on his federal income tax returns.

II.     *The "$70 Million" Deal*

A.     *First Advance Payment and Promissory Note*

Mr. Deutsch first learned of the deal at issue from Mr. Lamberth in June 2008 when the latter told him that Mr. Visel was working with investors from Dubai (Dubai Group[5]) to secure a $70 million investment to commercially develop a ranch Mr. Visel owned in Mexico. Mr. Lamberth had previously traveled to this ranch at least three times on family vacations with Mr. Visel.

Mr. Visel explained to Mr. Deutsch that he needed a $350,000 short-term loan as a deposit to open a UBS bank account in Geneva, Switzerland, in order for the Dubai Group to transfer the $70 million to Mr. Visel. Mr. Visel asked that Mr. Lamberth and Mr. Deutsch each lend him $175,000. Mr. Visel told Mr. Deutsch and Mr. Lamberth that he expected to repay them in less than one month.

On June 19, 2008, Mr. Visel signed a notarized promissory note, naming Mr. Lamberth and Mr. Deutsch the lenders of a principal sum of $350,000 at a 10% annual interest rate to be repaid by him in two months. The note granted the following security interests to Mr. Lamberth and Mr. Deutsch: (1) all of the rights to and possession of Las Casitas #1 in Akumal, Mexico, that Paul Visel was granted by Dr. Wiley Lee Campbell; (2) a "2nd lend" on Rancho Manuel and Buenos Aires Ranch in Yucatan, Mexico; and (3) a "1st lend" on an undivided 50% interest in three lots in Akumal, Mexico, held by a Delaware corporation, Arter Caribe, Inc.

---

[5] We note that the Dubai Group was sometimes referred to by trial witnesses as the "Dubai Investment Authority" and in a few Exhibits in the record as the "Dubai International Financial Center." For convenience, we will use "Dubai Group" throughout this Opinion.

[*4] On June 23, 2008, Mr. Deutsch borrowed $175,000 from the International Bank of Commerce and wrote a check to an account named "ESPANICA DBA CPHV VISION INC" (Espanica) that Mr. Visel said he controlled and was using for the deal. For his part, Mr. Lamberth could come up with only $150,000 and lent this amount to Mr. Visel rather than his entire half of the $350,000.

After the promissory note's two-month deadline passed, Mr. Visel still had not repaid the loan. Mr. Visel told Mr. Deutsch and Mr. Lamberth that a wide variety of issues was delaying him from securing the $70 million investment. Mr. Visel blamed multiple individuals that Mr. Deutsch was not familiar with for the delays and indicated a myriad of problems (i.e., certain documents were not signed, other documents were still being prepared, and one of the bank accounts was not properly set up). Mr. Deutsch and Mr. Lamberth did not attempt to enforce the promissory note because Mr. Visel assured them that these delays were temporary and the deal was on the verge of closing.

B.    *Living Expenses*

Mr. Visel told Mr. Deutsch and Mr. Lamberth that he was traveling between London, Geneva, and Dubai while he attempted to resolve the alleged bank issues. Mr. Visel said it was necessary for him to stay abroad because if he returned to the United States the deal would be "dead" and they would never recoup their investment. At this point, Mr. Visel did not have money to cover his living expenses himself. At first, Mr. Lamberth lent him money to pay these expenses, but soon Mr. Lamberth had financial difficulties of his own. On July 30, 2008, Mr. Deutsch started lending money to Mr. Visel to pay his expenses and continued to do so until March 17, 2010. During this 19-month period Mr. Deutsch sent Mr. Visel $291,200 via 53 separate bank transfers in increments ranging from $400 to $25,000 and $4,400 via Western Union to pay his expenses, which included hotel bills, air fares, and other personal living expenses.

C.    *Dubai Group Investors*

While the deal floundered, Mr. Deutsch learned about the people Mr. Visel was working with from the Dubai Group. According to Mr. Visel, his direct contact with the Dubai Group was an individual named Paul Davidson. Mr. Davidson claimed to represent Mohammed Aziz Mohammed and Omar Bin Sulaiman of the Dubai Group. Mr. Davidson was the central figure who provided information and directions to Mr.

[*5] Visel, including when and where to send bank transfers. Mr. Visel also told Mr. Deutsch that a former auditor at UBS named Peter was helping him to clear up bank issues.

D.    *Consecutive $200,000 Transfers*

In October 2009 Mr. Visel told Mr. Deutsch that the $70 million was in a UBS account and ready to be transferred, but a special type of account at Lloyds Bank in London needed to be opened with a balance of $2 million to receive such a large transfer. However, he said Mr. Davidson and Peter knew people at Lloyds Bank that could arrange for an account to be opened there with a minimum balance of $200,000. Mr. Visel asked Mr. Deutsch if he would pay this sum, but Mr. Deutsch replied he would not invest more without meeting the individuals involved in the deal.

On October 19, 2009, Mr. Deutsch and Mr. Lamberth traveled to London to meet with Mr. Visel and Mr. Davidson. Mr. Visel told Mr. Deutsch that he was working as a consultant with the Dubai Group setting up deals in Mexico, Panama, and Argentina, and he showed Mr. Deutsch a contract that would provide him a line of credit up to $300 million after the $70 million deal was completed.

On the afternoon of October 19, 2009, Mr. Deutsch spoke directly via telephone with Mr. Davidson, who assured him that (1) the $70 million was ready to be transferred but the $200,000 would need to be transferred that evening and (2) Mr. Davidson would meet them the following day to withdraw the $70 million. Mr. Visel gave Mr. Deutsch the details of an account at Lloyds Bank in the name of a company called Winilov Enterprises Ltd. (Winilov), which he claimed was his, and Mr. Deutsch arranged for the $200,000 transfer.

However, after Mr. Deutsch transferred the $200,000 to the Winilov account, Mr. Visel and Mr. Deutsch called Mr. Davidson, and Mr. Deutsch heard Mr. Davidson call Mr. Visel "an idiot" as it was the wrong account and he needed to send it to a different one. After the call, Mr. Visel assured Mr. Deutsch that the Winilov account was his, he had signature authority over it, and he would transfer the money back to him the following day. In the interest of time, Mr. Deutsch agreed to send another $200,000 on October 20, 2009, to an account in the name of JM Property Services, also at Lloyds Bank.

Mr. Deutsch contacted his bank to have the initial $200,000 returned from the Winilov account. Ultimately, Lloyds Bank indicated

**[*6]** that they could not return the $200,000 because they could not locate the beneficiary of the account. At this point, Mr. Visel explained that he no longer held signature authority over the account. Mr. Visel said he was working with those in control of the account to return the funds to him but ultimately it never occurred.

Upset over what was happening, Mr. Deutsch told Mr. Visel that he would instruct lawyers to start proceedings to recover the funds. In response, Mr. Visel said it would be dangerous to "rock the boat" when the banks were so close to releasing the $70 million and, at worst, he would repay him the $200,000 out of his share of the $70 million. Mr. Deutsch did not initiate proceedings at that time because of Mr. Visel's representations.

E.     *"Misprinted" Check*

After Mr. Deutsch sent the second $200,000 transfer, Mr. Visel told him and Mr. Lamberth that he had a meeting with Mr. Davidson and other members of the Dubai Group at Lloyds Bank on October 21, 2009. After the meeting, Mr. Visel returned to the hotel where Mr. Deutsch and Mr. Lamberth were staying and told them that he had been handed a check for $70 million but the Dubai Group printed his name on it as "Paul SVisel" rather than "Paul S Visel." As a result, they took it back, and Mr. Davidson told Mr. Visel he would give him a corrected one the next day. Because of other business commitments, Mr. Deutsch left London the next day.

Mr. Visel, however, never received a new check. Mr. Visel told Mr. Deutsch that when they went back to the bank to get the second check Mr. Davidson told him that the account had been opened as a "trading account," which meant that the balance could not be withdrawn for six months. According to Mr. Visel, Mr. Davidson said there was no way to get the money now unless they paid $4.2 million in penalties and fines for the early withdrawal. Mr. Visel further explained that he was told that the fines and fees could not be deducted from the $70 million balance allegedly in the account.

At this point, Mr. Deutsch began to question the deal. He emailed Mr. Visel on November 21, 2009, asking for him to provide the names, addresses, and phone numbers for all of the people he worked with on the deal. Mr. Deutsch was concerned that the individuals involved were taking advantage of Mr. Visel and either he or Mr. Lamberth needed their information in case something happened to Mr. Visel. Mr. Visel

[*7] never provided any information to Mr. Deutsch other than their names.

F. *December 2009 $350,000 Payment*

In December 2009 Mr. Visel said he had secured an outside investor to raise $1.7 million of the needed $4.2 million, and he would put in $2 million of his own money. However, they still needed $500,000. Mr. Visel said Lloyds Bank would permit him to inspect documents showing that the balance of $70 million was there but they first needed the $500,000 as a "good faith" payment that the balance of fines, fees, and penalties would be paid. Mr. Deutsch reluctantly agreed to pay $350,000 but asked that he also be shown the documents. Mr. Visel agreed, and told Mr. Deutsch that the $350,000 would remain in the JM Property Services account until they saw the documents.

On December 14, 2009, Mr. Deutsch sent $350,000 to the JM Property Services account. However, Mr. Visel told Mr. Deutsch that a mid-December snowstorm in London prevented his outside investor from landing to view the Lloyds Bank documents as planned. In early January 2010 Mr. Visel told Mr. Deutsch that this investor abandoned the deal.

On January 25, 2010, Mr. Deutsch traveled to London in order to view the promised documents at Lloyds Bank. On this trip, Mr. Visel's story about the $70 million deal changed from his original story of developing his ranch in Mexico. Mr. Visel now claimed he had proposed to the Dubai Group a development in Panama and he would be paid a 20% commission for securing the release of the $70 million. Mr. Visel also told Mr. Deutsch that he had lost the ranch in Mexico provided as security in the promissory note. Mr. Deutsch ultimately spent two days in London but was never able to see the promised documents.

G. *Calls from Mr. Davidson*

In March 2010 Mr. Deutsch began receiving phone calls on his office and cell phones from Mr. Davidson using a blocked international phone number. Mr. Deutsch was uncertain how Mr. Davidson learned his number but believed Mr. Davidson had received his phone numbers from Mr. Visel. Mr. Davidson told Mr. Deutsch that the deal had stalled because of Mr. Visel's errors. He stated that Mr. Visel was off the deal, he would be in charge now, and Mr. Deutsch would work directly with him. Mr. Deutsch told Mr. Visel about his conversation with Mr.

[*8] Davidson, and in response Mr. Visel stated that Mr. Davidson's statements were false as he was still in charge.

## H. *Financier David Stockard*

Also in March 2010 Mr. Lamberth helped Mr. Deutsch connect with a businessman, David Stockard. Although Mr. Stockard was not a banker himself, his professional experience included frequent banking and financial transactions in London, and he had contacts at the banks involved in the deal. Mr. Stockard agreed to travel to London on Mr. Deutsch's behalf to perform "basic due diligence" on the deal in return for a $50,000 retainer. Mr. Stockard met with Mr. Visel in London, and as a result of this meeting Mr. Stockard felt that the deal was likely a fraud.

In the past Mr. Stockard had attempted to do business with the Dubai Group, and he found them to be very professional, using extensive due diligence documents when they assessed business proposals. Mr. Visel on the other hand could not answer basic questions about the parties to the deal and loan documentation. The only contact information he could provide was a "Gmail" address for somebody who claimed to be a senior official with the Dubai Group. This was a bright red flag for Mr. Stockard because in his experience individuals at the Dubai Group always used company email addresses rather than easily falsified "Gmail" accounts.

Mr. Stockard called Mr. Deutsch and recommended that he return to London to hire fraud investigators, RISC Management Ltd. (RISC), and the law firm Peters & Peters Solicitors LLP (Peters & Peters), who had experience investigating fraud. On March 25, 2010, Mr. Deutsch traveled to London with Mr. Lamberth to meet with Mr. Stockard, investigators at RISC, and, at a subsequent meeting, attorneys from Peters & Peters. On April 9, 2010, Mr. Deutsch, Mr. Stockard, and RISC entered into an "upside" agreement to recover the funds owed to Mr. Deutsch in which any amount recovered over $1.7 million less expenses and professional fees would be divided equally among them. The attorneys from Peters & Peters billed for their time and effort.

## I. *Investigating Mr. Visel and the Dubai Group*

At this time Mr. Visel had no place to stay in London, so the investigators decided to begin the investigation by moving him into a hotel room they could access. They decided to keep Mr. Visel unaware

[*9] of the investigation. Therefore, the investigators and Mr. Stockard posed as investors interested in the $70 million deal and offered to help him get the funds released in order to contact and investigate the Dubai Group.

The investigators believed that Mr. Davidson and the Dubai Group thought the "fraud was still live." The investigators reported that on April 14, 2010, Mr. Davidson requested that Mr. Visel send another $500,000 to a Barclays Bank account. In continuing the ruse, Mr. Stockard's associate spoke with Mr. Davidson three times posing as a potential investor and attempted to set up a meeting. However, Mr. Davidson repeatedly canceled at the last minute. Ultimately, the investigators were never able to meet or identify Mr. Davidson or other members of the Dubai Group but concluded that they were likely using false names and misrepresented themselves. Because they could not identify the members of the Dubai Group, the investigators concluded recovery actions could not be taken against them.

During the investigation, the investigators observed that Mr. Davidson repeatedly tried to assure Mr. Visel that the money was real and Mr. Visel just needed to send additional funds to resolve the issue. On the basis of his interactions with Mr. Visel, Mr. Stockard believed that Mr. Visel was "over his head into fraud and ultimately turned out to be a participant."

The investigators also sought to identify the banker Peter that Mr. Visel stated was assisting with the deal. On the basis of their investigation, they believed it may have been a retired banker named Peter Sainsbury, who had recently been convicted of conspiracy to defraud in the United Kingdom. They could not definitively identify Peter Sainsbury as the Peter that worked with the Dubai Group and determined he would not have recoverable assets because of his recent conviction even if they could.

Finally, during the investigation, RISC members accessed Mr. Visel's computer without his knowledge and found documents and emails relating to the $70 million deal. In addition, two documents from the Peters & Peters file included agreements with Dubai Group members. One such document was an unsigned promissory note dated July 5, 2009, between Mr. Visel and "Mohammed Aziz Mohammed Private Lending" in the principal amount of $70 million at a 4.5% interest rate that would mature ten years from the date of signing. Another such document was a signed and notarized partnership

[*10] agreement between Mr. Visel and "Mohammed Aziz Mohammed Private Lending" dated July 5, 2009.

J. *Recovery from the Banks*

In addition to their attempt to identify recoverable assets, the investigators assessed whether Mr. Deutsch had any claim against the banks involved. The attorneys concluded that Mr. Deutsch's claim was weak because Mr. Deutsch was not a client of the banks and had no fiduciary relationship with them. The attorneys also advised Mr. Deutsch that suing the banks would be extremely expensive, the banks would likely defend any claim vigorously, and suing the banks could possibly subject Mr. Deutsch to counterclaims for damages.

K. *Statement and Transfer Agreement*

As the investigation continued, the investigators revealed their true identities to Mr. Visel, and Mr. Visel ceased contact with them. They suspected that Mr. Visel was staying in Florida. In August 2010 Mr. Deutsch lured Mr. Visel back to London. RISC located him and took him to Peters & Peters to get a statement of what happened. In his statement, Mr. Visel admitted only that he had been a victim of fraud and denied that he was a knowing participant. However, he admitted that he had learned in 2007 that the man claiming to be Omar Bin Sulaiman was actually Mohammed Ibn Saad, who claimed to work for Mr. Bin Sulaiman at the Dubai Group. In addition, Mr. Ibn Saad suggested that Mr. Bin Sulaiman did not know what he was doing. The attorneys from Peters & Peters believed Mr. Visel was not being entirely truthful, so they advised him not to sign the statement. At least one attorney was confident that the transaction involved a fraud and believed Mr. Visel may have started out innocently in it but that at some point he had "crossed the line."

On September 9, 2010, the attorneys at Peters & Peters persuaded Mr. Visel to sign an agreement transferring certain properties to Mr. Deutsch by November 8, 2010. However, the RISC investigators and the Peters & Peters attorneys had concluded previously that Mr. Visel no longer possessed any property or cash of substantial value. Mr. Visel represented that he had transferred ownership of two properties in Mexico, "Casita 301 Akumal" and "Arter Caribe Inc[.]," to his son six years before but agreed to get those properties transferred to Mr. Deutsch.

**[\*11]** Mr. Deutsch acquired copies of documents regarding the properties. Mr. Deutsch forwarded them to an attorney in Mexico who told him that the documents were copies that were "worthless" and not sufficient to transfer the property. This attorney also told Mr. Deutsch that any attempt to pursue a civil claim to recover these properties would likely be fruitless and expensive. The deadline passed, and Mr. Visel neither transferred the properties nor cooperated further with Mr. Deutsch.

Ultimately, Mr. Deutsch did not pursue civil or criminal charges against Mr. Visel or anyone else with respect to the $70 million deal. At the time of trial, Mr. Deutsch was not aware of Mr. Visel's current whereabouts but had heard from Mr. Lamberth that he was last working in Costa Rica.

L.    *2013 Email*

Mr. Deutsch sent an email to Mr. Visel on January 28, 2013, asking him to sign and notarize documents in order for the Mexican properties to be transferred. Mr. Visel sent an expletive-laden response and refused to send back the documents signed and notarized.

III.    *Petitioners' Tax Reporting and the Notice of Deficiency*

Petitioners prepared and timely filed (with the assistance of a certified public accountant (CPA)) their joint Form 1040, U.S. Individual Income Tax Return, for 2010 (joint return). As relevant here, they attached to the joint return Schedule A, claiming $2,075,597 of itemized deductions. On this Schedule A petitioners reported, among other items, a theft loss of $1,552,777.[6] Further information regarding this theft loss was shown on Form 4684, Casualties and Thefts, which they also attached to the joint return. Section A of the form, titled "Personal Use Property," identified two separate thefts: a $1,250,000 theft attributable to "Paul Visel Promissory Note/Theft 6/01/2008" and a $350,000 theft attributable to "Paul Visel – Theft of Money/Fraud 12/14/2009."

Following an examination of the joint return, the IRS determined in pertinent part that petitioners' theft loss deduction should be disallowed and that an accuracy-related penalty for a substantial understatement of income tax should be imposed. The August 27, 2014, Notice of Deficiency to petitioners reflects those determinations. The

---

[6] Petitioners now concede that the correct amount of the claimed theft loss is $1,377,005.

**[\*12]** record includes a completed Civil Penalty Approval Form for an accuracy-related penalty for a substantial understatement of income tax for 2010.[7] The form includes a signature on the line provided on the form for "Group Manager Approval to Assess Penalties Identified Above" dated May 29, 2013, nearly 15 months before the issuance of the Notice of Deficiency.

## OPINION

I.  *Burden of Proof*

In general, the Commissioner's determinations set forth in a Notice of Deficiency are presumed correct, and, except for the burden of production in any court proceeding with respect to an individual taxpayer's liability for any "penalty, addition to tax, or additional amount," *see* § 7491(c), the taxpayer bears the burden of proving that the Commissioner's determinations are erroneous, *see* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Furthermore, tax deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any claimed deduction. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). This specific burden requires the taxpayer to demonstrate that the deductions claimed are allowable pursuant to some statutory provision and to substantiate by producing adequate records that enable the Commissioner to determine the taxpayer's correct liability. § 6001; *Higbee v. Commissioner*, 116 T.C. 438, 440 (2001).

If the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining his or her federal income tax liability and meets certain other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue. *See* § 7491(a)(1) and (2). Petitioners do not contend, and the evidence does not establish, that the burden of proof shifts to respondent under section 7491(a)(1) and (2) as to any issue of fact.

---

[7] As explained *infra* pp. 22–24, we are reopening the record to admit the Civil Penalty Approval Form and a declaration of IRS Supervisory Internal Revenue Agent Cynthia Mendiola insofar as it authenticates the Civil Penalty Approval Form for the purposes of Rule 902(11) of the Federal Rules of Evidence.

**[\*13]** II.  *Theft Loss Deduction*

Section 165(a) permits a deduction against ordinary income for "any loss sustained during the taxable year and not compensated for by insurance or otherwise."  For individuals, the deduction is limited to (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit though not connected with a trade or business; or (3) losses of property not connected with a trade or business or a transaction entered into for profit if such losses arise from "fire, storm, shipwreck, or other casualty, or from theft."  § 165(c).

A theft loss deduction is sustained during the taxable year in which the taxpayer discovers it.  § 165(a), (e).  However, even after a theft loss is discovered, if a claim for reimbursement exists for which there is a reasonable prospect of recovery, the deduction may not be claimed until such time as the prospect no longer exists.  *Halata v. Commissioner*, T.C. Memo. 2012-351, at \*19–20 (first citing *Jeppsen v. Commissioner*, 128 F.3d 1410, 1414 (10th Cir. 1997), *aff'g* T.C. Memo. 1995-342; and then citing Treas. Reg. §§ 1.165-1(d)(2)(i), (3), 1.165-8(a)(2)).  Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances.  Treas. Reg. § 1.165-1(d)(2)(i).   "The standard to be applied is primarily objective, but the taxpayer's subjective attitude and beliefs are not to be ignored."  *Urtis v. Commissioner*, T.C. Memo. 2013-66, at \*16 (quoting *Premji v. Commissioner*, T.C. Memo. 1996-304, slip op. at 20, *aff'd*, 139 F.3d 912 (10th Cir. 1998) (unpublished table decision)).   The determination of whether a reasonable prospect of recovery exists is made at the time the taxpayer claims the deduction; the test is foresight, not hindsight.  *See Estate of Scofield v. Commissioner*, 266 F.2d 154, 163 (6th Cir. 1959), *aff'g in part, rev'g in part* 25 T.C. 774 (1956).

The term "theft" under section 165 is a word of general and broad meaning that includes any criminal appropriation of another's property, including theft by swindling, false pretenses, and other forms of guile.  *Edwards v. Bromberg*, 232 F.2d 107, 110 (5th Cir. 1956); Treas. Reg. § 1.165-8(d).  Whether a theft loss has occurred depends upon the law of the state where the alleged theft occurred.  *Bellis v. Commissioner*, 540 F.2d 448, 449 (9th Cir. 1976), *aff'g* 61 T.C. 354 (1973); *Luman v. Commissioner*, 79 T.C. 846, 860 (1982); *Paine v. Commissioner*, 63 T.C. 736, 740 (1975), *aff'd*, 523 F.2d 1053 (5th Cir. 1975) (unpublished table decision).  A taxpayer must prove a theft occurred under applicable state law by only a preponderance of the evidence and not beyond a reasonable

**[\*14]** doubt. *See Allen v. Commissioner*, 16 T.C. 163, 166 (1951) ("If the reasonable inferences from the evidence point to theft, the proponent is entitled to prevail. If the contrary be true and reasonable inferences point to another conclusion, the proponent must fail."). A criminal conviction, or even the prosecution of one, is not necessary in order for a taxpayer to demonstrate a theft loss. *See Monteleone v. Commissioner*, 34 T.C. 688, 694 (1960); *Price v. Commissioner*, T.C. Memo. 1971-323, 1971 Tax Ct. Memo LEXIS 8, at \*22. But the fact that a taxpayer does not claim or charge a crime of theft may raise doubts as to whether an "actual fraud" exists. *Price*, 1971 Tax Ct. Memo LEXIS 8, at \*22. Mr. Deutsch and respondent do not dispute that the law of the State of Texas applies in this case. Therefore, we will decide whether the evidence presented allows for us to determine that a theft occurred under Texas law.

Under Texas law, theft is defined as the unlawful appropriation of property "with intent to deprive the owner of [the] property." Tex. Penal Code Ann. § 31.03(a) (West 2011). An appropriation of property is unlawful if "it is without the owner's effective consent." *Id.* § 31.03(b)(1). An owner's consent is not effective if it is induced by deception. *Id.* § 31.01(3)(A). Under Texas law, deception means:

> (A) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true;
>
> (B) failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not believe to be true;
>
> (C) preventing another from acquiring information likely to affect his judgment in the transaction;
>
> (D) selling or otherwise transferring or encumbering property without disclosing a lien, security interest, adverse claim, or other legal impediment to the enjoyment of the property, whether the lien, security interest, claim, or impediment is or is not valid, or is or is not a matter of official record; or
>
> (E) promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without

**[*15]** other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.

*Id.* § 31.01(1). Thus, pursuant to Texas law, Mr. Deutsch suffered a theft loss if someone appropriated his money through deception and intended to deprive him of it.

Under this standard, petitioners argue that Mr. Deutsch suffered a theft loss because Mr. Visel and/or the Dubai Group appropriated Mr. Deutsch's money by deceiving him with the intent to deprive him of that money. Respondent, on the other hand, argues that there is no evidence that Mr. Visel made false statements; that petitioners have not shown that Mr. Visel had criminal intent; and that there is no evidence of a fraudulent theft committed by Mr. Visel or anyone else. We will take each of respondent's arguments in turn.

A.     *Mr. Visel's Acts of Deception*

We find unpersuasive respondent's argument that there is no evidence that Mr. Visel made false statements. First, the relevant standard is whether Mr. Visel performed an act of deception in a manner that precludes Mr. Deutsch's effective consent pursuant to Texas law. Second, we find the record indeed shows Mr. Visel performed acts meeting that definition.

The record shows that Mr. Visel created "a false impression" of fact regarding collateral he pledged as security in the June 19, 2008, promissory note. According to the note, Mr. Visel put up several properties as security on the loan including his 50% interest in Arter Caribe, Inc. However, Mr. Visel stated in an agreement signed September 9, 2010, that he did not own an interest in Arter Caribe, Inc., because he had transferred his ownership to his son approximately four years before he signed the promissory note. The promissory note does not disclose that Mr. Visel no longer owned this asset, and his failure to do so created a false impression of fact that affected Mr. Deutsch's judgment of the transaction pursuant to Texas law.

Additionally, Mr. Visel falsely represented to Mr. Deutsch that he had signature authority over the Winilov account. On October 19, 2009, Mr. Deutsch transferred $200,000 to the account; but immediately afterwards Mr. Davidson informed him and Mr. Visel that he had sent it to the wrong account. Mr. Visel assured Mr. Deutsch that he had signatory authority over the account and that he would return the funds

**[*16]** to him but asked him to send another $200,000 the following day to another account. Mr. Deutsch tried to get the funds from the first transfer returned to him until Mr. Visel told him that he in fact no longer had signature authority over this account. While it is possible that Mr. Visel was misinformed over his signature authority over that account, we think it is much more likely that he lied about his authority to induce Mr. Deutsch to send the additional funds. Thus, we find that he deceived Mr. Deutsch in this instance as defined under Texas law, and the deception affected Mr. Deutsch's judgment of the transaction.

### B. *Other Acts of Deception*

Furthermore, beyond Mr. Visel's acts of deception, Mr. Davidson misrepresented facts directly to Mr. Deutsch or through Mr. Visel.[8] Mr. Davidson's statements and actions indicate Mr. Davidson was deceiving either Mr. Visel or Mr. Deutsch in conjunction with Mr. Visel. Mr. Deutsch never met Mr. Davidson but spoke with him on the phone multiple times during which he made false statements concerning the $70 million deal and asked for additional funds. In addition, Mr. Davidson orchestrated Mr. Visel's actions by assuring him the funds were real.

For example, Mr. Deutsch spoke with Mr. Davidson via telephone before transferring $200,000 on October 19, 2009. Mr. Davidson misrepresented that if Mr. Deutsch transferred $200,000, the alleged $70 million would be released the following day. The alleged $70 million was not released. We conclude that Mr. Davidson deceived Mr. Deutsch in this instance as defined under Texas law.

In addition, Mr. Visel told Mr. Deutsch on October 21, 2009, that Mr. Davidson and other bankers presented him with a $70 million check. Mr. Visel said that they had printed the check to "Paul SVisel" rather than "Paul S Visel," so they took it back and stated he would be issued a corrected one the next day. However, Mr. Visel never received another check because he claimed Mr. Davidson told him the wrong type of account was used. We find credible Mr. Stockard's testimony at trial that this story is consistent with a fraud because bankers from an established institution such as Lloyds Bank would be able to resolve this issue immediately, if necessary. Under the circumstances we conclude that either Mr. Visel entirely fabricated the story to deceive Mr.

---

[8] As the investigators opined, we find that the name Mr. Davidson is likely a false identity; but for our purposes we will continue to refer to this individual as such.

**[\*17]** Deutsch or Mr. Davidson deceived them both as defined under Texas law.

### C.    *Appropriation and Intent to Deprive*

We have concluded that Mr. Visel and Mr. Davidson both deceived Mr. Deutsch while coaxing him to make multiple bank transfers.  We also conclude that someone appropriated Mr. Deutsch's money and intended to do so because it is the only plausible explanation consistent with a preponderance of the evidence.

However, the evidence does not definitively resolve the identity of the person who (1) appropriated Mr. Deutsch's money and (2) intended to deprive him of that money.  In other words, the evidence does not definitively resolve whether Mr. Visel ultimately appropriated Mr. Deutsch's money and acted with the intent to do so, or Mr. Davidson appropriated Mr. Deutsch's money and intended to do so while deceiving Mr. Visel.  Finally, it is also possible that an unknown third party directed them both with or without their being willing accomplices.

If we had to determine the identity of the thief, we would name Mr. Davidson.  Much of the evidence supports the proposition that Mr. Davidson directed Mr. Visel's actions with the intent to deprive whoever was lured to transfer funds anticipating Mr. Visel's fictitious pay day. Mr. Davidson represented himself as the central contact among the multiple parties: the Dubai Group, Lloyds Bank, UBS, Mr. Visel, and Mr. Deutsch.  Mr. Davidson informed Mr. Visel with Mr. Deutsch present that the funds could not be released for various reasons until they paid additional sums.  The investigators reported that Mr. Davidson avoided meeting them directly and appeared desperate to convince Mr. Visel that the funds were real and would be released after another payment.  The investigators reported that Mr. Davidson was the "originator of banking instructions" for Mr. Visel and during their investigation Mr. Davidson requested that another $500,000 be deposited into a new bank account on April 14, 2010.  Finally, Mr. Davidson also called Mr. Deutsch from a blocked international number and claimed Mr. Visel was out of the deal and that he would work directly with Mr. Deutsch to get the funds released.  We conclude these actions indicate that he intended to deprive Mr. Deutsch of his money (at times through Mr. Visel).

Even without direct evidence, we find that (1) Mr. Davidson would not have orchestrated the fraud unless he thought he would

**[\*18]** ultimately receive the wire transfers and (2) he did actually receive the wire transfers.[9]  In the alternative, even if Mr. Davidson was merely an unwitting facilitator of the advance fee scam, had no intent to deceive Mr. Deutsch, did not receive the wire transfers, and did not appropriate Mr. Deutsch's money, Mr. Deutsch still suffered a theft at the hands of whoever orchestrated the scheme. *See Halata*, T.C. Memo. 2012-351, at \*24–26 (finding that taxpayer suffered a theft loss pursuant to Texas law even though the identity of the thief that appropriated money was not definitively resolved in a fictitious bank-guaranty transaction); *see also Jensen v. Commissioner*, T.C. Memo. 1993-393, 1993 Tax Ct. Memo LEXIS 404, at \*12–13 (finding that taxpayers were entitled to a theft loss deduction even though they had contact only with their insurance broker, who invested their money in a Ponzi scheme and who was not alleged to have been part of the scheme), *aff'd*, 72 F.3d 135 (9th Cir. 1995) (unpublished table decision).

Respondent cites *Price*, 1971 Tax Ct. Memo LEXIS 8, and *Riley v. Commissioner*, T.C. Memo. 2016-46, for the proposition that the fact that criminal charges were not brought against Mr. Visel or anyone else weighs against finding that the requisite criminal intent existed. However, in this case the investigators were never able to identify or locate Mr. Davidson or other members of the Dubai Group, and so the fact that charges were not brought against them is unpersuasive. Furthermore, any weight we may assign to the failure to pursue criminal charges against Mr. Visel is negated by the fact that the evidence does not definitively resolve that he was the perpetrator and the investigators determined he did not have any recoverable assets.

Thus, we conclude that the bank transfers Mr. Deutsch made totaling $925,000 in the $70 million deal were lost on account of theft as defined by Texas law.[10]

---

[9] As might be predicted in an advance fee scam, the investigators could not identify the beneficial owners of the Espanica, Winilov, or JM Property Services accounts where Mr. Deutsch transferred the advance fee payments.

[10] This $925,000 is the total of the following transfers made by Mr. Deutsch: $175,000, $200,000, $200,000, and $350,000 on June 23, 2008, October 19, 2009, October 20, 2009, and December 14, 2009, respectively.

[*19]  D.  *Theft Loss Sustained in 2010*

As previously indicated, generally a theft loss is considered sustained during the year in which the taxpayer discovers it.  § 165(a), (e).  Thus, we must determine the year in which Mr. Deutsch discovered the loss.  Mr. Deutsch credibly testified that he realized in 2010, with the help of paid attorneys, a private investigation firm, and an individual with experience in London financial markets, that he had been defrauded.  Therefore, we conclude Mr. Deutsch discovered the theft in 2010.

The theft loss is not considered to have been sustained in 2010 if Mr. Deutsch had a claim for reimbursement with respect to which there was a reasonable prospect of recovery.  *See* Treas. Reg. § 1.165-1(d)(2)(i).  But we have previously held that for a taxpayer to no longer have a reasonable prospect of recovery, the "taxpayer is not required to be an 'incorrigible optimist,' and a claim for recovery with little potential for success will not require that the deduction be postponed."  *Geisler v. Commissioner*, T.C. Memo. 1988-404, 1988 Tax Ct. Memo LEXIS 432, at *7 (quoting *United States v. S.S. White Dental Mfg. Co.*, 274 U.S. 398, 403 (1927)), *aff'd*, 955 F.2d 47 (9th Cir. 1992) (unpublished table decision).

In September 2010, with the help of attorneys and investigators, Mr. Deutsch convinced Mr. Visel to agree to transfer Mexican properties owned by Mr. Visel's son to Mr. Deutsch by November 8, 2010.  However, Mr. Visel failed to do so.  Also in 2010, an attorney at Peters & Peters told Mr. Deutsch that further legal action against Mr. Visel or the Dubai Group was impractical because (1) Mr. Visel held very few assets; (2) they could not identify Mr. Davidson or any of his potential co-conspirators; and (3) claims against the banks that received the money transfers were weak because there was no fiduciary relationship with Mr. Deutsch and the banks would "defend vigorously" any claim while possibly subjecting Mr. Deutsch to counterclaims for damages.  In addition, Mr. Deutsch's attorney in Mexico told him that any attempt to recover the Mexican properties through legal action would not likely be fruitful and would be prohibitively expensive because Mr. Visel had transferred the properties to his son and provided Mr. Deutsch with only "worthless" copies of documents.

Respondent argues that Mr. Deutsch had a reasonable prospect of recovery through the end of 2010 because he sent an email to Mr. Visel in 2013 asking whether he would sign additional documents to transfer

**[*20]** the Mexican properties or pay him back. However, on the basis of Mr. Visel's response (and then lack thereof), we conclude the email correspondence does not demonstrate that a reasonable prospect of recovery existed.

We conclude that Mr. Deutsch did not have a reasonable prospect of recovery after Mr. Visel failed to meet the November 8, 2010, deadline and Mr. Deutsch was advised by his attorneys that other recovery methods would not be fruitful. Thus, Mr. Deutsch sustained the theft loss (totaling $925,000) in 2010.

E.     *Mr. Visel's Living Expenses*

Mr. Deutsch gave Mr. Visel $295,600 over 19 months to pay his living expenses while Mr. Visel claimed he was attempting to close the deal. Mr. Visel told Mr. Deutsch that he would repay him for the living expenses once the deal was done. Mr. Deutsch agreed to pay these expenses because he thought it was the only way to complete the deal and get his investment returned.

Mr. Deutsch claims he is entitled to a theft loss deduction for the amount he lent Mr. Visel to pay his living expenses and never recovered. However, while we conclude on a preponderance of the evidence that Mr. Deutsch suffered a theft loss for the payments he made in the $70 million deal, we do not conclude that Mr. Visel was the thief.

In fact, evidence suggests that Mr. Visel was likely defrauded himself, and he never wavered in his claims of innocence to the investigators. According to the investigators, Mr. Davidson appeared desperate to convince Mr. Visel that the $70 million existed, and Mr. Davidson directly called Mr. Deutsch once it seemed Mr. Visel was out of resources. In addition, attorneys conducting the investigation found a partnership contract and loan agreement for $70 million between Mr. Visel and a member of the Dubai Group. These seemingly official but likely fraudulent documents show that Mr. Visel may have been duped.

If Mr. Visel was defrauded himself, then he did not deceive Mr. Deutsch when he told Mr. Deutsch that he would repay him for the living expenses after the deal closed. Thus, we conclude that petitioners have failed to meet their burden of proof to establish that Mr. Visel committed theft as defined under Texas law and they are not entitled to a theft loss deduction with respect to funds advanced for Mr. Visel's living expenses.

**[\*21]** III.    *Section 6662(a) Penalty*

We now address whether petitioners are liable for an accuracy-related penalty pursuant to section 6662(a) and (b)(2) on an underpayment due to a substantial understatement of income tax.

Section 6662(a) imposes a 20% accuracy-related penalty on any portion of an underpayment of tax required to be shown on a return if, as provided by section 6662(b)(2), the underpayment is attributable to any "substantial understatement of income tax." For purposes of section 6662(b)(2), an understatement generally means the excess of the amount of tax required to be reported on the return over the amount shown on the return. § 6662(d)(2)(A). An understatement is substantial in the case of an individual if the understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return for that taxable year or $5,000. § 6662(d)(1)(A).

As indicated *supra* p. 12, respondent bears the burden of production with respect to petitioners' liability for the accuracy-related penalty, requiring him to come forward with sufficient evidence establishing that it is appropriate to impose this penalty in the absence of available defenses. *See* § 7491(c); *Higbee*, 116 T.C. at 446. Additionally, this initial burden of production under section 7491(c) includes producing evidence that the procedural requirements of section 6751(b) have been met; to wit, that the initial determination of the accuracy-related penalty has been "personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate." *See Graev v. Commissioner*, 149 T.C. 485, 492–93 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016); *see also Frost v. Commissioner*, 154 T.C. 23, 34 (2020); *Clay v. Commissioner*, 152 T.C. 223, 248 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021).

In *Swift v. Commissioner*, 144 F.4th 756, 770 (5th Cir. 2025), *aff'g* T.C. Memo. 2024-13, the U.S. Court of Appeals for the Fifth Circuit adopted the "timely supervisory approval" formulation set forth by the U.S. Court of Appeals for the Ninth Circuit in *Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066, 1074 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020). The Ninth Circuit in *Laidlaw's* ruled that supervisory approval is timely if secured "before the assessment of the penalty or, if earlier, before the relevant supervisor loses discretion whether to approve the penalty assessment." *Id.*

**[\*22]**  We follow the relevant precedent of the court of appeals to which an appeal would ordinarily lie. *See Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).  An appeal by petitioners would lie in the Fifth Circuit, and therefore *Swift* is controlling.  Trial of this case, however, was held, and the record was closed, before we issued *Graev* (and *Clay* and *Frost*).  Accordingly, in the light of *Graev*, we ordered respondent to file a response addressing the effect of section 6751(b) on this case and directing the Court to any evidence of section 6751(b) supervisory approval in the record, and petitioners to respond.  Respondent was unable to direct the Court to any evidence in the record that satisfies his burden of production with respect to section 6751(b)(1) and filed a Motion to Reopen the Record (Motion) to offer into evidence (1) the declaration of Ms. Mendiola[11] and (2) the Civil Penalty Approval Form dated before the issuance of the August 27, 2014, Notice of Deficiency and signed by Ms. Mendiola.  Petitioners objected to the introduction of any additional evidence with respect to the substantial understatement penalty and requested that the Court deny respondent's Motion.

Reopening the record for the submission of additional evidence lies within the Court's discretion. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 330 (1971); *Chieftain Int'l (U.S.), Inc. v. Se. Offshore, Inc.*, 553 F.3d 817, 820 (5th Cir. 2008); *Butler v. Commissioner*, 114 T.C. 276, 286–87 (2000); *see also Nor-Cal Adjusters v. Commissioner*, 503 F.2d 359, 363 (9th Cir. 1974) ("[T]he Tax Court's ruling [denying a motion to reopen the record] is not subject to review except upon a demonstration of extraordinary circumstances which reveal a clear abuse of discretion."), *aff'g* T.C. Memo. 1971-200.  We will not grant a motion to reopen the record unless, among other requirements, the evidence relied on is not merely cumulative or impeaching, is material to the issues involved, and probably would change some aspect of the outcome of the case. *Butler*, 114 T.C. at 287; *see also Chieftain Int'l (U.S.), Inc.*, 553 F.3d at 820 (explaining that trial courts, in deciding whether to allow a reopening of the record, should "weigh 'the importance and probative value of the evidence, the reason for the moving party's failure to introduce the evidence earlier, and the possibility of prejudice to the non-moving party'" (quoting *Garcia v. Woman's Hosp. of Tex.*, 97 F.3d 810, 814 (5th Cir. 1996))); *SEC v. Rogers*, 790 F.2d 1450, 1460 (9th Cir. 1986) (explaining that the trial court "should take into account, in considering a motion to hold open the trial record, the character of the additional [evidence] and the effect of

---

[11] Respondent subsequently supplemented Ms. Mendiola's declaration.

**[\*23]** granting the motion"), *abrogated on other grounds by Pinter v. Dahl*, 486 U.S. 622 (1988).

In reviewing motions to reopen the record, courts have considered when the moving party knew that a fact was disputed, whether the evidentiary issue was foreseeable, and whether the moving party had reason for the failure to produce the evidence earlier. *See, e.g., George v. Commissioner*, 844 F.2d 225, 229–30 (5th Cir. 1988) (and cases cited thereat) (holding that refusal to reopen the case was not an abuse of discretion because the issue was foreseeable to the taxpayers and the court could see no excuse for the taxpayers' failure to produce evidence earlier), *aff'g Frink v. Commissioner*, T.C. Memo. 1984-669. We also balance the moving party's diligence against the possible prejudice to the nonmoving party. In particular, we consider whether reopening the record after trial would prevent the nonmoving party from examining and questioning the evidence as it would have during the proceeding. *See, e.g., Estate of Freedman v. Commissioner*, T.C. Memo. 2007-61, slip op. at 28; *Megibow v. Commissioner*, T.C. Memo. 2004-41, slip op. at 16.

The evidence that is the subject of respondent's Motion would not be cumulative of any evidence in the record and would not be impeaching material. Respondent bears the burden of production with respect to the substantial understatement penalty and would offer the evidence as proof that the requirements of section 6751(b)(1) have been met. The subject evidence is material to the penalty issue here, and the outcome of that will be changed if we grant respondent's Motion.

Petitioners argue that the issue of whether respondent met his burden of proof regarding the accuracy-related penalty was raised in their Petition and Opening Brief, respondent failed to exercise due diligence when he failed to introduce written supervisory approval before trial, and they would be prejudiced by not being allowed to cross-examine Ms. Mendiola or the revenue agent who conducted the examination of the joint return. However, when this case was submitted and the record closed, *Graev* (as well as *Clay* and *Frost*) had not been issued. We agree with respondent that the evidence he now wishes to have admitted into the record is not cumulative and is material to the penalty issue in this case. We also agree with respondent that the Civil Penalty Approval Form is a record kept in the ordinary course of business activity and is authenticated by the declaration of Ms. Mendiola. We will admit this document into evidence and the declaration for purposes of authentication under Rule 902(11) of the

**[\*24]** Federal Rules of Evidence. *See Clough v. Commissioner*, 119 T.C. 183, 190–91 (2002).

We now must decide whether respondent's evidence is sufficient to satisfy his initial burden of production under section 6751(b)(1). *See Swift v. Commissioner*, 144 F.4th at 770. Since the Civil Penalty Approval Form for petitioners was approved by Ms. Mendiola, who was the revenue agent's immediate supervisor, before the Notice of Deficiency was issued to them, the IRS complied with section 6751(b).

Respondent having complied with the requirements of section 6751(b)(1), we now turn to the remainder of his initial burden of production under section 7491(c), i.e., whether petitioners' understatement of income tax for 2010 was substantial. As a result of our holdings herein with respect to the theft loss deduction and petitioners' concession with respect to the miscellaneous itemized deduction for investment expenses, *see supra* note 2, it would appear that the Rule 155 computation must confirm a substantial understatement of income tax by petitioners. Should the Rule 155 computation show a substantial understatement of income tax (which we think it will), we conclude that respondent has met his burden of production for the accuracy-related penalty under section 6662(b)(2).

Assuming there is a substantial understatement of income tax in this case, petitioners can avoid application of the accuracy-related penalty under section 6662(b)(2) with respect to any portion of the underpayment for which they can show that they had reasonable cause and acted in good faith. § 6664(c)(1); *Higbee*, 116 T.C. at 448–49. Whether a taxpayer has acted with reasonable cause and in good faith depends upon the pertinent facts and circumstances of a particular case. Treas. Reg. § 1.6664-4(b)(1). We consider, among other factors, the experience, education, and sophistication of the taxpayer; however, the principal consideration is the extent of the taxpayer's efforts to assess the proper tax liability. *Id.*; *see also Higbee*, 116 T.C. at 448. In so assessing, reliance on professional advice may indicate reasonable cause and good faith "if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Treas. Reg. § 1.6664-4(b)(1).

Petitioners contend that they had a reasonable basis for claiming the theft loss deduction. We agree. Mr. Deutsch credibly testified as to the conversations he had with, and the documents he provided to (all of which are in the record), petitioners' CPA regarding the series of

**[\*25]** transactions he engaged in with Mr. Visel. As a result of those conversations and the documents, the CPA instructed him that petitioners were entitled to a theft loss deduction. On the basis of the record in this case, we conclude that petitioners reasonably relied on the advice of their CPA (who prepared the joint return) and acted with reasonable cause and in good faith in claiming the theft loss deduction.[12] Accordingly, petitioners are not liable for the accuracy-related penalty.

IV.    *Conclusion*

We conclude that petitioners are entitled to a theft loss deduction of $925,000 for 2010. Additionally, assuming the Rule 155 computation confirms a substantial understatement of income tax, but because petitioners have demonstrated reasonable cause, we do not sustain the accuracy-related penalty.

In reaching our holdings, we have considered all of the arguments made by the parties and, to the extent not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[12] We also note that given the CPA's involvement with the entire joint return, petitioner acted with reasonable cause and good faith in claiming a miscellaneous itemized deduction for investment expenses in an amount greater than what the IRS allowed in the Notice of Deficiency. *See supra* note 2.